**UNITED STATES of America, Intervenor, Appellant,**

v.

**Ernest J. FLOOD, Intervenor, Appellee.**

**No. 5226.**

United States Court of Appeals First Circuit.

Heard June 5, 1957.

Decided July 17, 1957.

Joseph F. Goetten, Atty. Dept. of Justice, Washington, D. C., with whom Charles K. Rice, Asst. Atty. Gen., and Ellis N. Slack, A. F. Prescott and Fred E. Youngman, Attys., Dept. of Justice, Washington, D. C., Anthony Julian, U. S. Atty., and John M. Harrington, Jr., Asst. U. S. Atty., Boston, Mass., were on the brief, for appellant.

Edward F. Harrington, New Bedford, Mass., for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

The only question on this appeal is whether a lien of the United States for unpaid federal taxes, as applied to a vessel owned by the taxpayer, takes precedence over various maritime liens for supplies furnished to the said vessel.

On February 11, 1954, Norlantic Diesel Inc. filed a libel in admiralty in the United States District Court for the District of Massachusetts against the Oil Screw Fishing Vessel Abram H., her engines, boats, tackle, apparel and furniture. In due course a number of claimants to an interest in the vessel petitioned to intervene in the proceeding, among them the parties to the present appeal, namely, the United States and Ernest J. Flood. The United States claimed a lien for unpaid taxes in the amount of $7,431.28 assessed against the owner of The Abram H, Angell Fisheries, Inc., a Massachusetts corporation, between November, 1947, and March, 1953. Flood asserted claims resting (1) on a first preferred ship mortgage dated May 31, 1947, (2) on a second preferred ship

mortgage dated June 10, 1952, and (3) on maritime liens for supplies furnished to the vessel between November 8, 1946, and October 17, 1949, by one Alfred Costa, d/b/a Big Chief Market, in the total of $6,901.34. In the sworn intervening petition by Flood, it is asserted that the said Flood, on December 3, 1952, advanced to the owner of the vessel the funds wherewith to pay off the lien claim of Costa in the sum of $6,901.34, on which date Flood took an assignment from Costa of the said account and is the present holder thereof. See The Minnie and Emma, D.C.D.Md.1927, 21 F.2d 991.

Several other parties filed petitions to intervene, which were allowed by the district court. However, no further reference will be made to them because the claims of these parties are no longer in issue, the sole dispute on this appeal being between the United States and Flood.

Angell Fisheries, Inc., at no point appeared before the district court which, on motion of the libellant, pronounced the owner in default and ordered The Abram H to be sold. Intervenor Flood purchased the vessel at the sale held on May 14, 1954, for the sum of $22,600.00. Shortly thereafter Flood filed a motion with the district court requesting permission, in view of his claims to the proceeds based on the ship mortgages and the maritime liens, to deposit with the court only the sum of $2,260.00 and to retain the balance of the purchase price, namely, $20,340.00. The motion went on to say that Flood agrees "that should it be determined that his claim to all or some part of such $20,340.00 balance is not prior to all other claims, he will pay into the Registry of this Court such part or all of such $20,340.00 as to which his claim is not prior. He further agrees to secure such undertaking by posting his bond in the amount of $3,500.00 * * *." The district court allowed the motion.

While the case was pending in the district court, the United States conceded that Flood's first preferred mortgage had top priority, and that issue was per-

manently removed from controversy. Thereafter, on December 5, 1956, the district court filed a memorandum opinion which ruled "that the Government tax lien is secondary to the maritime liens owned by Ernest J. Flood, and since his liens will exhaust the funds in court, the Government cannot recover." The district court found it unnecessary to make any reference to Flood's second preferred mortgage, since it is clear that the maritime liens first obtained by Costa, and then assigned to Flood, were preferred liens by virtue of the fact that they arose prior in time to the second ship mortgage, and as such outranked the said mortgage. See 46 U.S.C.A. § 953.

The final decree of the district court, entered December 28, 1956, in accordance with the aforesaid memorandum opinion, adjudged that the claim of Ernest J. Flood was superior to all other maritime and tax liens, and further adjudged that the amount of money then held in the registry of the court, amounting to $1,383.85, be turned over to Flood forthwith; that Flood's bond of $3,500.00 be surrendered and returned to him forthwith; "and that the claims of all intervening petitioners be denied and the matter closed." The United States duly appealed from this final decree.

The record in this case does not establish with clarity the precise amount now in controversy between the parties, but as near as we can compute it this sum is $6,134.85. Of the $2,260.00 which Flood deposited in the registry, there remains for disposition, after allowances for statutorily imposed court costs and other expenses, the net amount of $1,383.85, which is the sum awarded to Flood by the final decree of the district court. Of the $20,340.00 retained by Flood from the proceeds of sale of The Abram H, there must be deducted $15,589.00 which, according to Flood's motion of May 18, 1954, was the unpaid amount secured by Flood's first preferred mortgage and which the government conceded had priority. This would leave the sum of $4,-751.00 which, added to the $1,383.85 in the registry, gives a total of $6,134.85 now in controversy.

■■ Counsel for the United States tried the case in the district court, and prosecuted this appeal, on the understanding "that the tax liens of the United States (except one) had arisen and been recorded prior to the time the maritime liens claimed by the appellee arose", and accordingly devoted the greater part of the main brief to establishing the proposition that a government tax lien outranked a *later-arising* maritime lien. It appears, however, that the government erred in its assumption of fact, at least in part, for the record discloses that supplies in the amount of $2,848.51 were furnished to The Abram H by August 22, 1947, a date prior to the date when the government's first tax assessment list against Angell Fisheries, Inc., was received in the Collector's office, which is when the government's tax lien arose, as provided in § 3671 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 3671. Since the government's lien for taxes can reach only the taxpayer's interest in the specific property at the time the lien attaches, and since at that time there was already in existence a maritime lien in the sum of $2,848.51 in favor of the supplier, giving the supplier a proprietary interest in the vessel, it is obvious that, as to this amount, the maritime claim of Flood must have priority. But this point becomes unimportant, for in our view the government's tax lien is always subordinate to a maritime lien for supplies, even if the tax lien arises first.

■ The government's lien for taxes is based upon the provision of § 3670 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 3670, reading as follows:

"If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, penalty, additional amount, or addition to such tax, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United

States upon all property and rights to property, whether real or personal, belonging to such person."

Assuming, as we do, that this provision of § 3670, unqualifiedly giving a lien "upon all property and rights to property" belonging to the taxpayer, applies to a vessel owned by the taxpayer, we note at once that the lien so imposed must be described as a "non-maritime lien," since it did not arise out of a maritime transaction. See Robinson on Admiralty § 49 (1939). Though there is no doubt of the paramount power of the Congress to alter in favor of the United States the settled priorities of liens under the general maritime law, the question is whether we can read such a legislative purpose into the simple language of § 3670, which contains no express provision giving priority to the government's tax lien and which, indeed, does not profess to modify the familiar rules of the general maritime law. See United States v. The Pomare, D.C.D. Hawaii 1950, 92 F.Supp. 185, 188. It may be relevant in this connection that, in enacting the Ship Mortgage Act of 1920, 41 Stat. 1000, 46 U.S.C.A. § 911 et seq., the Congress made no reference to federal tax liens and gave no indication of an intention to establish the priority of such tax liens over maritime liens generally.

Throughout the long history of the general maritime law, maritime liens have uniformly been given preference over secured non-maritime claims of other kinds, both prior and subsequent. See, e. g., The Favorite, D.C.D.Or.1875, 8 Fed.Cas. 1104, No. 4699 (subsequent mortgage); The J. E. Rumbell, 1893, 148 U.S. 1, 13 S.Ct. 498, 37 L.Ed. 345 (prior mortgage). The theoretical basis for the primacy of maritime claims is that they "attach to the vessel itself as an instrument of commerce," while other claims are derived only through the owner. See The Guiding Star, C.C.1883, 18 F. 263, 264. Accordingly, maritime liens have taken priority over claims of the United States when the vessel has been forfeited to the government, The St. Jago de Cuba, 1824, 9 Wheat. 409, 22 U.S. 409, 6 L.Ed. 122. See also Conard v. Atlantic Ins. Co., 1828, 1 Pet. 386, 26 U.S. 386, 7 L.Ed. 189.

While we cannot say that the decided cases are in total agreement on the issue now before us regarding the relative standing of maritime liens and federal tax claims, the weight of authority seems to support appellee Flood's position. Two cases have squarely held a tax claim of the United States is outranked even if it antedates a maritime lien for supplies. The River Queen, D.C.E.D.Va. 1925, 8 F.2d 426; The J. R. Hardee, D.C. S.D.Tex.1952, 107 F.Supp. 379. See also 35 Yale L.J. 876 (1926). The contrary decision in Colonna's Shipyard, Inc., v. Rowe, 4 Cir., 1926, 14 F.2d 267, is entirely unpersuasive, for the reasons stated in Gilmore & Black, The Law of Admiralty 622 (1957). The government also heavily relies upon The Melissa Trask, D.C.Mass.1923, 285 F. 781. This decision of course is not binding on this court, but we note that on the specific issue now before us the government expressly conceded in The Melissa Trask that a maritime lien for supplies took precedence over a government tax lien. The actual holding in the case has been much criticized. See Fridlund, "Federal Taxes and Preferred Ship Mortgages," 38 Harv.L.Rev. 1060 (1925).

If the far-reaching step of upsetting the well-established system of priority of maritime liens should be taken, it seems to us that the Congress is much better equipped to work out a comprehensive solution of the problems involved, for example, to determine which types of maritime claims will be relegated to a position junior to a tax claim of the government and which types of maritime claims will remain senior to it. See Gilmore & Black, The Law of Admiralty 624 (1957).

A judgment will be entered affirming the decree of the District Court.